Randall K. Rathbun #09765
Depew Gillen Rathbun & McInteer LC
8301 E. 21st Street, Suite 450
Wichita, KS  67206-2936
Telephone:  (316) 262-4000
randy@depewgillen.com

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

| | |
|---|---|
| JAMES and THERESA ARNOLD | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No.:   16-1309-JTM-TJJ |
| | ) |
| MAXMIND, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

# RESPONSE TO DEFENDANT'S
# MOTION TO DISMISS

The Arnolds have been living in what has been described as a "digital hell"

since 2011.  They have been accused of the most vile and disgusting acts,

including theft, harboring runaway girls and making pornographic movies.  Law

enforcement as well as total strangers came to their home repeatedly.  The Butler

County Sheriff's Department received weekly reports about fraud, scams, stolen

Facebook accounts, missing person reports, and even suicide threats from the VA

that appeared to come from the Arnolds.

Through it all, the Arnolds could not understand why someone would possibly undertake such conduct toward them.  They enlisted the help of law enforcement, Verizon, and even a well respected Wichita law firm to help them discover who was attempting to ruin their lives--but all to no avail.

In the spring of 2016, they finally discovered that the conduct was not aimed at them–but at their property, when an on-line magazine published an article describing their situation.  This article, by an investigative reporter for Fusion, was entitled "How an Internet Mapping Glitch Turned a Random Kansas Farm into a Digital Hell."  The article blamed the "digital hell" on a Massachusetts company, the defendant  MaxMind, Inc.

This case was filed soon after the article was brought to the plaintiffs' attention.

## I.   STATEMENT OF FACTS

Pursuant to FRCP Rule 15(a)(1)(B), the plaintiffs filed an Amended Complaint on September 15, 2016. (Doc. 10).  The Amended Complaint was filed within 20 days of the receipt of the defendant's Motion to Dismiss (Doc. 4). The plaintiffs hereby incorporate by reference the factual allegations contained in the Amended Complaint as their statement of facts.  As this Court noted in *McKinzy v. IRS*, Case No. 13-CV-2474-EFM-JPO, U.S. Dist. LEXIS 36092 (D. Kan. Mar. 19, 2014), in the face of a Rule 12(b)(6) motion to dismiss, the Court must do so. Accordingly, the plaintiffs' statement of facts is as follows:

1.     The plaintiffs are husband and wife and residents of the state of Kansas.  They reside in rural Butler County, northeast of Potwin, Kansas ("the residence").

2.     MaxMind, Inc., is a Delaware corporation founded in 2002 with a principal place of business located at 14 Spring Street, 3rd Floor in Waltham, Mass.  The defendant may be served with process by service on its registered agent, Harvard Business Services, Inc., 16192 Coastal Hwy., Lewes, DE 19958.

3.     This action involves a dispute between citizens of different states and the amount in controversy is in excess of $75,000.  Accordingly this Court's jurisdiction is invoked under 28 USC §1332.  Venue is proper in this Court under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claim occurred in this judicial district.

*Background of the Action*

4.     In March 2011, the Arnolds signed a lease agreement to lease the residence, effective May 1, 2011.  They loved the home as it was out in the country, and the landlord gave the Arnolds and their two boys permission to hunt and fish on the surrounding 623 acres.  The location of the residence was perfect as their sons attended the nearby Berean Academy in Elbing and Mrs. Arnold's mother was in a nearby nursing home.

5.     The first week after the Arnolds moved in, two deputies from the Butler County Sheriff's Department came to the residence looking for a stolen

3

truck.  This scenario repeated itself countless times over the next 5 years.  The plaintiffs were repeatedly awakened from their sleep or disturbed from their daily activities by local, state or federal officials looking for a runaway child or a missing person, or evidence of a computer fraud, or call of an attempted suicide. Law enforcement officials frequently and repeatedly came to and telephoned the residence all hours of the day or night.

6.     Private individuals also sought out the plaintiffs' address. Angry business owners claimed that someone at the residence was sending their businesses thousands of email and clogging their computer systems. Private investigators came onto the plaintiffs' property for various reasons. Strangers entered the plaintiffs' property looking for parties. People parked their vehicles on the township road around the plaintiffs' land and took pictures of the plaintiffs' property or tried to connect to the plaintiffs' internet.

7.     In 2013, the Butler County Sheriff Department ran a background check on the plaintiffs because of all the activity taking place at the residence. After this check, the plaintiffs were told that a "LDNS Server" was located on the property and that the Sheriff Department received weekly reports about fraud, scams, stolen Facebook accounts, missing person reports, suicide threats from the VA that appeared to come from the address and stolen vehicles all related to the residence.  Each incident brought law enforcement to the residence–at all hours

4

of the night and day. Law enforcement frequently telephoned the plaintiffs to investigate, often interrupting their sleep.

8.      Threats began to be made against the plaintiffs by individuals who were convinced that the perpetrator of internet scamming lived at the residence. State investigators – convinced that the plaintiffs had been involved in an identity theft – came to the residence to take pictures of assets.

9.      The following events appeared to originate at the residence and brought trespassers and/or law enforcement to the plaintiffs' home at all hours of the night and day: stolen cars, fraud related to tax returns and bitcoin, stolen credit cards, suicide calls, private investigators, stolen social media accounts, fund raising events, and numerous other events.

10.      The plaintiffs made many attempts at discovering the cause of these problems over the years. In April 2013, the plaintiffs contacted Verizon about the LDNS server believed to be located at the property, but it turned out not to be the cause of the problems. Starting in May 2013, the plaintiffs participated in an investigation of the problems relating to the property conducted by a private Wichita, Kansas law firm hired by the plaintiffs' landlord. The plaintiffs also sought the help of local law enforcement in determining the cause of the problems.  All of the plaintiffs' efforts to determine the cause failed.

11.      In the spring of 2016, the plaintiffs discovered the cause of their problem when an investigative reporter for Fusion wrote an article entitled "How

an Internet Mapping Glitch Turned a Random Kansas Farm into a Digital Hell."
The article blames the "digital hell" on a Massachusetts company, the defendant
MaxMind, Inc.

12.     MaxMind claims that it provides IP intelligence through the GeoIP
brand. According to its website, over 5,000 companies use GeoIP data to locate
their Internet visitors and show them relevant content and ads, perform analytics,
enforce digital rights, and efficiently route Internet traffic. The defendant claims
that businesses can obtain additional insights into their customers' connection
speeds, ISPs, and more using GeoIP data.

13.     As noted in the Fusion article, IP refers to the Internet Protocol, a
unique identifier assigned to a computer or computer network.  The IP plays an
essential role in computers talking to each other and every internet-connected
device needs one.  Sophisticated sleuthing can allow one to find out information
about an IP address.

14.     According to the article, the problem started in 2002 when the
defendant decided it could make money by providing IP intelligence to companies
that wanted to know the location of computers accessing their websites.

15.     IP mapping is not an exact science.  When it is at its most precise, it
can be mapped to a house.  At its least precise, it can be mapped to a country.
Incredibly, MaxMind made the decision to set a default location for IP addresses
at the residence when it was unable to pinpoint the IP address of a user.

On information and belief, Maxmind was indifferent to the likelihood that this decision—to link millions of IP addresses to the residence by default—would harm or endanger the people who live at residence.

16.     Accordingly, for the last 14 years, every time Maxmind's database was queried about a location in the United States it could not identify, it sent the inquiry the plaintiffs' address.  There are now over 600 million IP addresses associated with the plaintiffs' leasehold. Many of these IP addresses are associated with or have been used for illegal, immoral, or embarrassing purposes including fraud and child pornography. Over 5,000 companies draw information from MaxMind's database.

17.     MaxMind publishes free, public downloadable databases on its website which falsely linked the plaintiffs' residence with millions of IP addresses that had been used for illegal, immoral, or embarrassing purposes. These databases are available for download without charge and are updated monthly. On information and belief, thousands of individuals and entities have used the information published in these databases.

18.     On information and belief, Maxmind also sells access to databases which falsely linked the plaintiffs' residence with millions of IP addresses used for illegal, immoral, or embarrassing purposes, and published that information to thousands of its customers.

19.     The defendant's conduct has resulted in Mr. Arnold being reported as holding girls at the residence for the purpose of making pornographic films.

The plaintiffs have been painted as criminals, hackers, and fraudsters by the information published by Maxmind. The plaintiffs have been variously accused of email and website hacking, stealing identities, property crimes and subjecting others to electronic or physical harassment and cyber crimes.  The plaintiffs' reputation in the community has been lowered as a result.

20.    The defendant's conduct has caused an almost constant barrage of unwanted visitors and telephone calls to come to the plaintiffs' residence day and night since they moved in.  The defendant's conduct has thus unreasonably and substantially impaired the plaintiffs' peaceful use and enjoyment of their property.  The plaintiffs have as a result suffered substantial and unreasonable annoyance, discomfort, inconvenience, and loss of peace of mind relating to their property.

21.    The defendant's conduct has intentionally caused numerous persons to enter or remain upon the plaintiffs' land without the plaintiffs' consent or permission and interfere with the plaintiffs' exclusive possession of their residence.

22.    The defendant's conduct has been outrageous and unreasonable, and has placed the plaintiffs in a false light, defamed them, and invaded their privacy.

23.    As a result of the defendant's reckless and grossly negligent conduct, the plaintiffs have sustained great emotional distress, fear for their safety, humiliation, and depression.  The plaintiffs have regularly lost sleep, and Mrs. Arnold has even slept in her clothes and shoes out of fear. The plaintiffs have

been afraid to be home and afraid to leave their home because of what might happen while they are gone. They have been advised by law enforcement that it may be necessary to shoot and kill their dog in order to enter their residence to investigate any of the regular reports of suicide coming from the residence.

## II.   Argument and Authority

### A.   *The Standard*

This Court is well aware of the standard to be applied to a FRCP Rule 12(b)(6) motion to dismiss. As this Court recently noted in *Strategic Energy Income Fund III, L.P. v. Stephens Energy Group, LLC*, 2016 U.S. Dist. LEXIS 110357 (D. Kan. Aug. 18, 2016), under Rule 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)); see also *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the

nature of the claims as well as the grounds upon which each claim rests. See

*Robbins v. Okla.*, 519 F.3d 1242, 1248 (10th Cir. 2008) (internal citations

omitted); *Parks v. Kiewel*, No. 6:15-1196-JTM-GEB, 2015 U.S. Dist. LEXIS

155979, 2015 WL 7295457, at *7 (D. Kan. Nov. 18, 2015).

B.  *The Amended Complaint Alleges*
    *Sufficient Facts to Establish Severable*
    *Cognizable Causes of Action*

The plaintiffs' Amended Complaint contains facts sufficient to plead

multiple plausible claims including, but not limited to, outrage, false light,

invasion of privacy, defamation, and nuisance.

*1. Outrage*

The defendant notes in its Memorandum that the plaintiffs may not have a

claim for negligent infliction of emotional distress, yet oddly fails to see the

plaintiffs clearly have a cognizable claim for the related tort of outrage, or

intentional infliction of emotional distress. (Doc. 5). The plaintiffs state a claim of

outrage in their Amended Complaint.

Kansas law recognizes the tort of outrage. *Hoard v. Shawnee Mission Med.*

*Ctr.*, 233 Kan. 267, 280, 662 P.2d 1214 (1983). Plaintiffs can recover damages for

their emotional distress under an outrage claim regardless whether they suffered

any physical impact or injury. *Id.* To state a claim for outrage, plaintiffs must

sufficiently allege facts to establish (1) the conduct of the defendant was

intentional or in reckless disregard of the plaintiffs, (2) the conduct was extreme

and outrageous, (3) there was a causal connection between the defendant's

10

conduct and the plaintiffs' mental distress, and (4) the plaintiffs' mental distress is extreme and severe. *Id.*

Recklessness, for purposes of outrage, comes in two varieties. *Id.* (quoting *Wiehe v. Kukal*, 225 Kan. 478, 483–84, 592 P.2d 860 (1979)). In one, the defendant knows or has reason to know of facts which create a high degree of risk of harm to another and deliberately proceeds to act in conscious disregard of, or indifference to, that risk. In the other, the defendant knows or has reason to know of the facts but does not realize or appreciate the high degree of risk involved, although a reasonable person in the defendant's position would. *Wiehe*, 225 Kan. at 483–84 (quoting Restatement (Second) of Torts § 500 cmt. a (1963)).

To be extreme and outrageous enough to support an outrage claim, the defendant's conduct must go beyond the bounds of decency and be atrocious and utterly intolerable in a civilized society. *Id.* Liability rests where the recitation of the facts of the case to an average member of the community would arouse his resentment against the defendant and lead him to exclaim "outrageous!". *Gomez v. Hug*, 7 Kan. App. 2d 603, 609, 645 P.2d 916 (1982). The court must determine, in the first instance, whether the defendant's conduct may be regarded as so extreme and outrageous as to permit recovery, and where reasonable minds could differ, the question goes to a jury. *Dawson v. Assocs. Fin. Servs., Co.*, 215 Kan. 814, 824, 529 P.2d 104 (1974).

Many kinds of conduct may be extreme and outrageous enough to support an outrage claim. In *Gomez v. Hug*, 7 Kan. App. 2d 603, 645 P.2d 916 (1982), for

example, the Kansas Court of Appeals held that the defendant's unprovoked racial slurs made the plaintiff fearful for his job and family and were therefore sufficiently extreme and outrageous to be submitted to a jury.

Here, the Amended Complaint alleges facts to establish the elements of an outrage claim. Paragraph 15 alleges that

> Maxmind made the decision to set a default location for IP addresses at the residence when it was unable to pinpoint the IP address of a user. On information and belief, Maxmind was indifferent to the likelihood that this decision—to link millions of IP addresses to the residence by default—would harm or endanger the people who live at the residence.

A reasonable person in the defendant's position would have appreciated the high degree of risk involved in this decision. The defendant acted with reckless indifference to the safety of the plaintiffs, and as alleged in paragraph 24 of the Amended Complaint, this reckless conduct caused the plaintiffs "great emotional distress, fear for the safety, humiliation, and depression." The Amended Complaint continues, "The plaintiffs have regularly lost sleep, and Mrs. Arnold has even slept in her clothes and shoes out of fear. The plaintiffs have been afraid to be at home and afraid to leave their home because of what might happen while they are gone." The plaintiffs were afraid that law enforcement, on one of their continual investigatory visits to the residence, would be forced to shoot and kill the plaintiffs' family dog. (Doc. 10, ¶ 24). Like the defendant in *Gomez v. Hug*, *supra*, the defendant's unprovoked actions here caused the plaintiffs to fear for their safety and the safety of their children.

In light of the callous indifference exhibited by the defendant in selecting the plaintiffs' residence as the geolocation for millions of IP addresses, and the extreme emotional harm it has caused the plaintiffs, the defendant's conduct is appropriately described as atrocious and utterly intolerable in a civilized society. The plaintiffs have the right to have their grievance heard by a jury of average members of the community to know whether they would exclaim "outrageous!".

### 2. False Light/Invasion of Privacy

The defendant asserts the Complaint lacked facts to establish the publication element of a false light invasion of privacy claim. The plaintiffs' Amended Complaint, however, clearly alleges that the defendant published false statements connecting the plaintiffs to millions of IP addresses to the public.

To state a claim for invasion of privacy by false light, the plaintiff must establish (1) publication to a third party, (2) that the publication falsely represents plaintiff, and (3) that the representation would be highly offensive to a reasonable person. *Watson v. City of Kansas City*, 185 F. Supp. 2d 1191, 1209 (D. Kan. 2011). The defendant takes issue only with the first element, publication. In the context of a false light claim, publication means "the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* (quoting *Ali v. Douglas Cable Comm.*, 929 F. Supp. 1326, 1383 (D. Kan. 1996)). Distribution of the information to a large number of persons constitutes sufficient

publicity for a false light claim. *Id.* (citing Restatement (Second) of Torts § 652D cmt. a).

The plaintiffs' Amended Complaint states, in paragraph 12, that "over 5,000 companies use GeoIP data to locate their Internet visitors," through the defendant's GeoIP brand. Paragraph 17 states the defendant "publishes free, public downloadable databases on its website which falsely linked" the plaintiffs with illegal, immoral, and embarrassing activities, and "thousands of individuals and entities have used the information published in these databases," which led them to the plaintiffs. These allegations more than adequately establish that the false information about the plaintiffs was made public by communicating it to a large number of persons.

The defendant doesn't dispute that associating millions of IP addresses with the plaintiffs' residence falsely represented the plaintiffs. It does mention, off the cuff, that there's nothing "inherently offensive" in connecting an unknown IP address to a default location. On the contrary, connecting millions of unknown IP addresses to the place the plaintiffs live with their children, publishing that information to the public and thousands of paying customers, and thus causing a constant barrage of often angry callers and trespassers to intrude on the plaintiffs is more than enough to offend a reasonable person. Ultimately it is the province of a jury—not the defendant—to determine whether a reasonable person would be offended. The plaintiffs' Amended Complaint alleges sufficient facts to justify such a trial.

### *3. Defamation*

In addition to the torts of outrage and false light invasion of privacy, the plaintiffs' Amended Complaint adequately alleges facts to establish a cognizable claim for defamation. Defamation comes in two varieties, libel and slander, the former of which requires communication in writing. The elements of any defamation claim are (1) false and defamatory words, (2) communication to a third party, and (3) resulting harm to the reputation of the person defamed. *El-Ghori v. Grimes*, 23 F. Supp. 2d 1259, 1269 (D. Kan. 1998). Damages for emotional distress are recoverable as parasitic damages if the plaintiff is first able to prove special damage to reputation. *Govin v. Globe Pub. Co.*, 232 Kan. 1, 6, 649 P.2d 1239 (1982). A plaintiff can prove damage to reputation by showing, among other things, that his or her reputation in the community has been lowered as a result of the defamation. *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1072 (D. Kan. 2006).

Here, the defamation claim jumps off the pages of the Amended Complaint. The defendant falsely associated millions of IP addresses with the plaintiffs. (Doc. 10 ¶ 16). As noted earlier, the defendant doesn't dispute that this was a false representation. Many of the IP addresses to which the defendant falsely connected the plaintiffs had been used for illegal, immoral, or embarrassing purposes, (Doc. 10 ¶ 16), such as computer fraud, child pornography, attempted suicide, and identity theft to name a few. (Doc.10 ¶¶ 5, 7, 9). The defendant communicated these defamatory statements to thousands of third parties in

writing through its public IP-geolocation databases and proprietary, subscription databases. (Doc. 10 ¶¶ 17–18). The plausible, if not obvious, result was that the plaintiffs' reputation in the community has been lowered. (Doc. 10 ¶¶ 19, 22). Paragraph 24 of the Amended Complaint details the severe emotional distress the defendant's actions have cause the plaintiffs. The Amended Complaint thus pleads a plausible claim for defamation and resulting reputation and emotional distress damages.

### 4. Nuisance

The Amended Complaint clearly states yet another cognizable claim for relief: nuisance. A nuisance is an annoyance, and any act or omissions by one which gives offense to or endangers the life or health, or obstructs the reasonable and comfortable use and enjoyment of the property of another may be said to be a nuisance. *Culwell v. Abbott Constr. Co.*, 211 Kan. 359, Syl. ¶ 1, 506 P.2d 1191 (1973). A private nuisance is a tort related to an unlawful interference with a person's use or enjoyment of his or her land. *Id.* Syl. ¶ 2.

Courts have been careful to explain that nuisance is not a type of tortious conduct in itself, but rather is an independent field of tort liability. *Burdette v. Vigindustries Inc.*, 2014 U.S. Dist. LEXIS 34727, at *36 (D. Kan. Mar. 17, 2014). Nuisance is a result, not a cause. It has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission that caused the invasion or harm. *Id.* (quoting *Culwell*, 211 Kan. 359). There are three types of acts or omissions that can cause a nuisance: (1) an intentional invasion of

the plaintiffs' interest, (2) a negligent invasion, or (3) conduct that is abnormal and out of place in its surroundings and thus falls within the principal of strict liability often referred to as the *Rylands v. Fletcher* theory. *Id.* (quoting *Culwell*, 211 Kan. 359).

Under Kansas law, a lessee or tenant may recover damages sustained during his or her tenancy from a nuisance that affects his or her use and enjoyment of the premises. *Klassen v. Cent. Kan. Coop. Creamery Ass'n*, 160 Kan. 697, 705, 165 P.2d 601 (1946); *Robertson v. Dunnegan*, No. 64,777, 1991 Kan. LEXIS 75, 810 P.2d 747, at *17–18 (Kan. Apr. 12, 1991); *see also Martin v. Chicago, R.I. & P.R. Co.*, 81 Kan. 344, 105 P. 451 (1910) (affirming judgment in favor of a tenant farmer for nuisance against railroad).

Under a nuisance theory, a plaintiff may recover damages for mental suffering, including annoyance, inconvenience, and peace of mind, without proof of physical injury or economic loss. *Bolin v. Cessna Aircraft Co.*, 759 F. Supp. 692, 718–19 (D. Kan. 1991); *Maddy v. Vulcan Mats. Co.*, 737 F. Supp. 1528, 1538 (D. Kan. 1990) ("In nuisance actions . . . recovery for inconvenience and annoyance is permissible because the mental sufferings of the plaintiff can be seen as arising directly and naturally" from the nuisance). This Court in *Bolin v. Cessna Aircraft Co.*, denied a defendant's 12(b)(6) motion to dismiss for failure to state a claim for emotional distress damages from maintenance of a nuisance. The *Bolin* court explained that while a plaintiff may not recover "emotional damages" in a nuisance case, he may recover for interference with the comfortable

enjoyment of his property interest which may include damages for annoyance, discomfort, inconvenience, and peace of mind. 759 F. Supp. at 718–19. The court further noted that no physical or economic injury is necessary for a plaintiff to recover damages to these "psychic" interests in a nuisance action. *Id.* (citing *Klassen v. Cent. Kan. Coop. Creamery Ass'n*, 160 Kan. 697, 165 P.2d 601 (1946); *Davis v. City of Kan. City*, 204 Kan. 524, 464 P.2d 154 (1970)); *see also Steifer v. City of Kan. City*, 175 Kan. 794, 798, 267 P.2d 474 (1954). This is consistent with the rule in most jurisdictions. *See* 142 A.L.R. 1307, 1316 (1943) (cited in *Brillhardt v. Ben Tipp, Inc.*, 297 P.2d 232, 235 (Wash. 1956)).

Courts around the country have found nuisances on facts similar to those alleged in the Amended Complaint. For instance, frequent, harassing phone calls to a particular phone number can constitute an actionable nuisance. Take *Macca v. Gen. Tel. Co.*, 495 P.2d 1193 (Ore. 1972), where Oregon's highest court held a telephone company liable for nuisance for erroneously listing the plaintiff's phone number as the after-hours number for a local florist. The plaintiff testified she received numerous telephone calls intended for the florist, many of which were angry in tone, and that they regularly interrupted her dinner and her sleep. She felt compelled to answer calls even after she'd gone to bed because of the slim possibility it was her son calling in need of help. The plaintiff suffered "nervousness" from the constant barrage of calls. On these facts, *Macca* held "the erroneous listing of the plaintiff's telephone number and the numerous telephone calls to plaintiff resulted in an invasion of plaintiff's rights to enjoy her property

18

without unreasonable interference. As such it is governed by the law relating to a private nuisance." *Id*. at 418. The court upheld her claim for damages for personal inconvenience, annoyance, and discomfort despite a lack of physical injury or economic loss. *Id*. at 419.

The Washington Supreme Court has likewise found nuisance liability on facts similar to those in the Amended Complaint. In *Brillhardt v. Ben Tipp, Inc.*, 297 P.2d 232, 235 (Wash. 1956), the state's highest court found Ben Tipp, Inc. liable to Brillhardt for nuisance for erroneously printing Brillhardt's phone number in an advertisement that was circulated to thousands of Ben Tipp's potential customers. Brillhardt showed she received constant phone calls continuously for several months as a result. The court held she was entitled to damages for annoyance and inconvenience, even without a showing of physical injury or pecuniary loss. *Id*. at 727–28.

These cases are not isolated. Several other courts agree that frequent, annoying telephone calls can constitute an actionable nuisance. *See Jacobson v. Consumer Portfolio Servs.*, No. 10-cv-643-bbc, 2011 U.S. Dist. LEXIS 156995, at *16–17 (W.D. Wisc. Feb. 28, 2011) (concluding that Wisconsin law does not bar private nuisance claims arising out of harassing telephone calls); *Sofka v. Thal*, 662 S.W.2d 502, 509 (Mo. 1983) (acknowledging that repeated phone calls could, under the right circumstances, constitute an actionable nuisance, but finding the petition failed to allege sufficient facts to set forth a nuisance claim); *Roland v. Slesinger*, 185 N.Y.S.2d 303, 304 (N.Y. Sup. Ct. 1959) (noting that telephone calls

may be enjoined as a nuisance if sufficiently aggravated to cause damage);

*Wiggins v. Moskins Credit Clothing Store, Inc.*, 137 F. Supp. 764, 767 (D.S.C. 1956) (holding plaintiff's complaint alleged a cause of action for nuisance based on repeated telephone calls that amounted to an interference with the peaceful enjoyment of the plaintiff's home).

The plaintiffs' Amended Complaint clearly alleges a claim for private nuisance. The allegations show the defendant erroneously published the plaintiffs' geolocation to the public as being the physical location of millions of IP addresses. (Doc. 10 ¶ 15). The defendant acted intentionally or at least negligently. (Doc. 10 ¶ 24). These actions caused countless persons to intrude on the plaintiffs' enjoyment of their residence in an onslaught of telephone calls and in-person visits. (Doc. 10 ¶¶ 5–8, 20). Paragraph 20 alleges the "defendant's conduct has caused an almost constant barrage of unwanted visitors and telephone calls to come to the plaintiffs' residence day and night since they moved in." Many, if not most, of these calls and visits were harassing, angry, and intimidating. (Doc. 10 ¶¶ 6, 8). This constant barrage continued uninterrupted for years, (Doc. 10 ¶ 20), and often disturbed the plaintiffs in the middle of the night while they were trying to sleep. (Doc. 10 ¶¶ 5, 7,9, 20, 24). The conditions caused by the defendant made the plaintiffs lose sleep and fear for their safety while at home. (Doc. 10 ¶ 24).

In sum, the Amended Complaint alleges the defendant intentionally or negligently interfered with the comfortable use and enjoyment of the plaintiffs'

residence, and that the defendant's interference was continual, substantial, and unreasonable. The Court should therefore allow the plaintiffs' Amended Complaint proceed on a nuisance theory.

C.     *The Plaintiffs' Claims Are Not Barred by the Statute of Limitations*

Though at first glance the defendant's statute of limitation arguments might seem persuasive, they don't hold up under close analysis. Properly analyzed, none of the plaintiffs' claims are time barred. The plaintiffs' nuisance claim arose anew with each new injury to the plaintiffs' comfortable enjoyment of their residence caused by the defendant's actions. The plaintiffs' claims for defamation and false light invasion of privacy likewise arose anew with each monthly publication of the defendant's databases.  And all of the plaintiffs' claims are subject to the discovery rule under which the cause of action accrues only when the fact of the plaintiffs' injury became reasonably ascertainable—in this case, the spring of 2016.

Nuisance claims are subject to the two-year limitations period in K.S.A. 60-513(a). The key to applying the statute of limitations is the date the nuisance is deemed to accrue. Under the continuing tort doctrine, "where a cause of action is predicated on numerous acts occurring over an extended period, the cause of action accrues anew with each act, at least until the injury becomes permanent." *Cordon v. Trans World Airlines, Inc.*, 442 F. Supp. 1064, 1066 (D. Kan. 1977); s*ee also Tibiri v. CIGNA Corp.*, 89 F.3d 1423, 1430 (10th Cir. 1996) ("[W]here a tort

involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury."). Such continuing torts remain timely not because the limitations period is tolled, but because the cause of action continues to accrue. The doctrine "applies where there is no single incident that can fairly or realistically be identified as the cause of significant harm." *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 710 (10th Cir. 2012) (quoting *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002)).

Kansas courts apply the continuing tort doctrine to claims of continuing nuisance where the nuisance is recurring, temporary, and abatable. *See, e.g.*, *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 346–47, 15 P.3d 338 (2000) (finding that recurring flooding of the plaintiff's property was an abatable, continuing nuisance and thus not barred by two-year limitation period, and that plaintiff was entitled to recover damages for the two years prior to filing the petition); *Gowing v. McCandless*, 219 Kan. 140, 144, 547 P.2d 338 (1976) ("Where the injury or wrong is classified by the courts as . . . temporary, transient, recurring, continuing or consequential in nature, it has been held that the limitations starts to run only when the plaintiffs' land or crops are actually harmed by overflow, and for purposes of the statute of limitations, each injury causes a new cause of action to accrue, at least until the injury becomes permanent.").

Here, the plaintiffs have alleged a cognizable claim for a continuing nuisance. The plaintiffs claim injuries to the comfortable enjoyment of their

residence occurring continuously starting from the time the plaintiffs moved into their home on or about May 1, 2011. (Doc. 10 ¶ 4). Like recurring flood waters, unwanted callers and visitors searching out the plaintiffs continually intruded upon the plaintiffs' property because of the defendant's actions. This constitutes a nuisance, and this nuisance claim is timely under the continuing tort doctrine because each new intrusion gave rise to a new cause of action for nuisance. Consequently, the plaintiffs are entitled to damages caused by the nuisance occurring in the two years preceding the date the plaintiffs' filed their original Complaint (Doc. 1).

Similarly, the plaintiffs' defamation and false light invasion of privacy claims accrued with each new publication of the defendant's databases. *See, e.g., Polin v. Dun & Bradstreet, Inc.*, 511 F.2d 875, 877 (10th Cir. 1975) (noting that the defendant's publications may constitute a continuing tort that does not fully accrue until the final publication in plaintiff's invasion of privacy case, and collecting cases in support). Defamation is governed by the one-year limitation period in K.S.A. 60-514, and false light invasion of privacy by the two-year period in K.S.A. 60-513(a). *Rinsley v. Brandt*, 446 F. Supp. 850, 858 (D. Kan. 1977). Under the law of defamation, the cause of action accrues at the time of publication of the defamatory statement. *Id.* at 852. Each communication of a defamatory statement to a third person generally constitutes a new publication and gives rise to a separate cause of action against the publisher. *Wright v. Bachmurski*, 29 Kan. App. 2d 595, 600–01, 29 P.3d 979 (2001). Any single

integrated publication, such as one edition of a newspaper, book, magazine, or broadcast, is treated as a single communication giving rise to a cause of action. *Id.* at 602 (citing Restatement (Second) of Torts § 577A (1977)). By way of illustration, assume on one occasion A says to B that C is a murderer. On a later occasion, A repeats the same statement to B. On a third occasion, A makes the statement to D. Each of the three communications is a separate publication and C has three causes of action against A. Restatement (Second) of Torts § 577A cmt. a (1977). Likewise, if the same defamatory statement is published in the morning and evening editions of a newspaper, each edition would be a separate single publication and there would be two causes of action. *Id.* cmt. d. The repetition justifies a new cause of action. *Id.*

Like defamation, false light invasion of privacy requires a publication of the false statement to be actionable. Each separate, integrated publication of a false statement should give rise to a separate cause of action for invasion of privacy, just as in the defamation context. *See Rinsley*, 446 F. Supp. at 854 (noting the Kansas Supreme Court applies defamation principles in field of privacy torts). This is the rule followed in jurisdictions that have considered the question. *See, e.g.*, *Khaury v. Playboy Publications, Inc.*, 430 F. Supp. 1342, 1345–45 & n.4 (S.D.N.Y. 1977) (noting that at least eight other jurisdictions expressly apply the single publication rule to false light claims).

Here, the Amended Complaint alleges that the defendant published the false and defamatory statement about the plaintiffs (that their residence was the

geolocation of millions of IP addresses) in a free, publicly available online database which the defendant updated and published anew monthly. (Doc. 10 ¶ 17). Each monthly update of the public database, like each daily edition of a newspaper, constitutes a separate, independent publication and cause of action for defamation and false light. The plaintiffs may recover reputation and parasitic damages for emotional distress based on each separate defamatory publication made in the year preceding the filing of the petition. Additionally, the plaintiffs may recover damages for emotional distress for invasion of privacy based on each separate false publication made in the two years preceding the filing of the petition.

Furthermore, all of the plaintiffs' causes of action are timely under Kansas's discovery rule. K.S.A. 60-513(b) states that the plaintiffs' claims "shall not be deemed to have accrued . . . until the fact of injury becomes reasonably ascertainable" to the plaintiffs. The discovery rule of 60-513(b) applies where the fact of injury is not reasonably ascertainable until some time after the initial act. *Id.* Whether and when the fact of injury was reasonably ascertainable is a question of fact to be resolved by a jury. *Benne v. IBM*, 87 F.3d 419, 426 (10th Cir. 1996) (citing *Gilger v. Lee Constr. Inc.*, 249 Kan. 307, 820 P.2d 390 (1991)).

The "fact of injury" standard postpones the running of the limitations period until the time the plaintiff is able to determine his or her injuries may be caused by the defendant. *Benne*, 87 F.3d at 427. The proper application of the discovery rule to the plaintiffs' claims in this case is illuminated by *Gilger v. Lee*

*Constr., Inc.*, 249 Kan. 307, 820 P.2d 390 (1991). In *Gilger*, the plaintiffs suffered a strange variety of recurring health problems for years without realizing that the cause was an improperly installed furnace. The plaintiffs unsuccessfully investigated multiple suspected causes of their illnesses, even having the furnace inspected three times. But it took a full three years and a fourth inspection to learn that the defendant had caused the problem by improperly installing the furnace years earlier.

The defendant in *Gilger* prevailed on a motion for summary judgment on the basis that the plaintiffs' negligence claims were barred by the two-year statute of limitations. The Kansas Supreme Court reversed, applying the discovery rule and holding that it was for a jury to decide whether the fact of plaintiffs' injuries was reasonably ascertainable before the two-year limitations period. *Id.* at 322. In so holding, the court reasoned that the realization of injury and damages alone, without the realization of the cause of the injury, is insufficient for the cause of action to accrue. *Id.*

The plaintiffs' claims in this case didn't accrue until plaintiffs were able to determine the defendant may be the cause of their injuries. This occurred when an investigative reporter for Fusion wrote an article entitled "How an Internet Mapping Glitch Turned a Random Kansas Farm into a Digital Hell" in the spring of 2016. (Doc. 10 ¶ 12). Prior to the spring of 2016, the cause of plaintiffs' injuries simply wasn't reasonably ascertainable. The plaintiffs exercised reasonable diligence in searching out the cause of their recurring injuries by contacting

Verizon in connection with a reported LDNS server believed to be located on their farm, participating in an investigation of the cause of their problems conducted by a private Wichita, Kansas law firm, and engaging law enforcement for help in determining the cause. (Doc. 10 ¶ 10). All of the plaintiffs' efforts were to no avail, yet it's impossibly difficult to conceive of other or further actions a reasonable person in their position would have taken to discover the cause of their mysterious injuries.

Just like the plaintiffs in *Gilger*, the plaintiffs in this case knew they were being injured, but they couldn't reasonably determine that the defendant may be the cause. And, just like the Kansas Supreme Court in *Gilger*, this Court should find that a jury must decide whether the fact of the plaintiffs' injuries was reasonably ascertainable before the two-year limitations period.

The defendant hastily remarks that the discovery rule doesn't apply to defamation claims. The defendant, however, leaves out the important caveat that this is true for defamation by mass media publication, *e.g.*, newspapers and television broadcasts, but not necessarily true for other types of defamation. *See Rinsley v. Brandt*, 446 F. Supp. 850, 853 (D. Kan. 1977). The discovery rule can apply to claims for defamation by other means that are more discrete, harder to discover by the plaintiff, and not as constitutionally protected as mass media communications. *Id.* (citing *Grove v. Dun & Bradstreet, Inc.*, 438 F.2d 433 (3rd. Cir. 1971)). For instance, the discovery rule applies in cases of defamation by a credit reporting agency because the plaintiff, as a member of the public, has less

access to the publication than he does to mass media and, "more importantly," because a credit reporting agency doesn't enjoy the constitutional protections given mass media publications. *Id.* (quoting *Grove*, 438 F.2d 433); *see also McKown v. Dun & Bradstreet, Inc.*, 744 F. Supp. 1046, 1049–50 (D. Kan. 1990) ("This court believes that the Kansas Supreme Court would adopt the discovery rule for the accrual of a cause of action for libel based on false credit reporting."). This Court has also applied the discovery rule to defamation claims based on defamatory oral statements which were "likely to go undiscovered until long after the statute of limitations has run." *Hobson v. Coastal Corp.*, 962 F. Supp. 1407, 1410 (D. Kan. 1997).

Here, the defendant's publications were far from readily discoverable by the plaintiffs. While the defendant's databases where it published the false and defamatory statements about the plaintiffs' association with various IP addresses were publicly available, they were hardly as accessible to the plaintiffs as a mass media publication such a newspaper or television broadcast. The defendant's publications were much more like the publications made by a credit reporting agency. They were discrete, unlikely to be discovered by the plaintiffs, and not given the same high level of First Amendment protections as mass media publications. The Court should therefore find that the discovery rule applies to the plaintiffs' defamation claims alleged in the Amended Petition, and allow a jury to decide when the fact of the plaintiffs' injuries was reasonably ascertainable.

28

Furthermore, the discovery rule applies to false light invasion of privacy claims. The defendant insinuates that false light claims are exempt from the discovery rule. But the defendant fails to recognize that unlike defamation, claims for false light invasion of privacy are subject to the two-year limitations period in K.S.A. 60-513(a). *Rinsley*, 446 F. Supp. at 858. Subsection (b) of 60-513 contains the discovery rule, which applies to "the causes of action listed in subsection (a)." The plain language of the statutory discovery rule applies to false light claims.

While it's true that *Rinsley* says the Kansas Supreme Court has expressly noted the applicability of defamation principles to the field of privacy, it's not true that either the Kansas Supreme Court or this Court have held the discovery rule doesn't apply to false light claims. It appears Kansas courts haven't directly considered the issue. The Tenth Circuit, however, has decided that under Oklahoma law, the discovery rule indeed applies to false light claims. *See Erikson v. Farmers Grp., Inc.*, 151 F. App'x 672, 676 (10th Cir. 2005).

The defendant also raises the statute of repose contained in K.S.A. 60-513. As an initial matter, the defendant cites the five-year statute of repose in subsection (d) of 60-513. This is wrong. Subsection (d) applies to "A negligence cause of action by a corporation or association against an officer or director of the corporation or association." Obviously this case is brought by two individuals against a corporation. Subsection (d) doesn't apply. The applicable statute of repose, rather, is the ten-year period in subsection (b), which states "but in no

event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

The statute of repose doesn't bar the plaintiffs' claims. As discussed previously, the plaintiffs' nuisance claim is a continuing, abatable tort for which the plaintiffs may recover damages during the two-year period preceding the filing of the complaint. The plaintiffs' false light, defamation, and outrage claims, which are subject to the discovery rule, accrued at the earliest when the plaintiffs' moved into their residence on May 1, 2011—well within the ten-year period of repose. The false light and defamation claims are further saved from the statute of repose because each monthly publication of the defendant's databases constitute a new cause of action for defamation and invasion of privacy, and the plaintiffs may thus recover damages sustained from each new publication during the one or two years, respectively, preceding the filing of the petition. The statute of repose simply isn't an issue in this case.

D.   *The Court Has Specific Personal Jurisdiction Over the Defendant*

*1. The Standard*

The plaintiffs need only make a prima facie showing of personal jurisdiction to defeat a pre-trial motion to dismiss for lack of personal jurisdiction. *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir. 1984). In deciding the motion, the Court must take the allegations in the complaint as true to the extent they are uncontroverted by the defendant's

affidavits and resolve all factual disputes in the plaintiff's favor. *Id.* The plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation of the moving party. *Id.*; *accord Key Indus. V. O'Doski, Sellers & Clark*, 872 F. Supp. 858, 861 (D. Kan. 1994). The plaintiff may make a prima facie showing by presenting by written materials facts that if true would support jurisdiction over the defendant. *OMI Holdings v. Royalty Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). To defeat the plaintiff's prima facie showing, the defendant must present a "compelling case" that the presence of some other considerations would render jurisdiction unreasonable. *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

2.  *This Court Has Specific Personal Jurisdiction Over the Plaintiffs' Claims Against the Defendant.*

The defendant's cursory attack on personal jurisdiction fails to recognize the Court's specific jurisdiction under the tortious conduct provision of the Kansas long-arm statute, and fails to assert any consideration whatsoever that would render jurisdiction unreasonable in this case.

There are two broad types of jurisdiction a state can exercise, specific and general. *Merriman v. Crompton Corp.*, 282 Kan. 433, Syl. ¶ 5, 146 P.3d 162 (2006); *accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, n.15 (1985). Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the state. *Merriman*, 282 Kan. Syl. ¶ 5. Subsection (b)(1) of the Kansas long-arm statute, K.S.A. 60-308, defines when

courts in Kansas can exercise specific jurisdiction over a nonresident defendant. *Id*. K.S.A. 60-308(b)(1) provides that

> Any person whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the following acts, thereby submits the person . . . to the jurisdiction of the courts of this state for any claim for relief arising from the act: . . .
> (B) committing a tortious act in this state.

Subsection (b)(2) of the long-arm statute defines when courts in Kansas can exercise general jurisdiction over a nonresident defendant. General jurisdiction refers to the power of a state to adjudicate *any* cause of action involving a particular defendant, regardless where the cause of action arose. *Merriman*, 282 Kan. Syl. ¶ 5; *accord Burger King Corp.*, 471 U.S. at n.15. Subsection (b)(2) of the long-arm statute permits courts to exercise general jurisdiction over a defendant if there is substantial, continuous, and systematic contact with this state that would support such jurisdiction consistent with the Constitution of the United States. K.S.A. 60-308(b)(2).

This Court clearly has specific jurisdiction over the plaintiffs' causes of action against the defendant under the tortious act provision of K.S.A. 60-308(b)(2). Kansas law holds that "when an injury occurs within this state as a result of a negligent act outside the state, the tortious act provision of the long arm statute will support the exercise of personal jurisdiction." *Merriman*, 282 Kan. at 460 (citing *Ling v. Jan's Liquors*, 237 Kan. 629, 632–33, 703 P.3d 731 (1985)). In *Ling v. Jan's Liquors*, the Kansas Supreme Court upheld a finding of personal jurisdiction over a Missouri liquor store for the plaintiff's negligence

claim based on the store's selling alcohol to a minor in Missouri which caused the minor to injure the plaintiff in a car accident occurring in Kansas. Here, the plaintiffs' injuries occurred in Kansas as a result of the defendant's tortious conduct elsewhere. The defendant's acts nevertheless support personal jurisdiction under K.S.A. 60-308(b)(2).

In determining the existence of personal jurisdiction, the Court has a duty to ensure that its exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In cases such as this where the Court exercises specific jurisdiction, due process requires the defendant have minimum contacts with the forum state such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Internat'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Tenth Circuit considers each prong—minimum contacts and traditional notions of fair play and substantial justice—separately. The stronger the plaintiffs' showing on minimum contacts, the more the defendant must show in unreasonableness to defeat jurisdiction. Similarly, an especially strong showing of reasonableness may serve to fortify a borderline showing of minimum contacts. *OMI Holdings v. Royalty Ins. Co. of Canada*, 149 F.3d 1086, 1090–91 (10th Cir. 1998) (quoting *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994)).

The minimum contacts requirement is satisfied if the defendant has purposefully directed its activities at residents in the forum and the litigation results from alleged injuries that arise out of or relate to those activities. *OMI*

*Holdings*, 326 F.3d at 1090–91 (quoting *Burger King Corp.*, 471 U.S. at 472). The defendant needn't have any physical presence in the forum. *Rainy Day Books, Inc. v. Rainy Day Books & Café, L.L.C.*, 186 F. Supp. 2d 1158, 1163 (D. Kan. 2002) (citing *Burger King Corp.*, 471 U.S. at 476). Purposeful availment may occur by even a single act for which the defendant should reasonably anticipate being haled into court in the forum. *Id.* Courts routinely exercise personal jurisdiction over a defendant based on the defendant's maintenance of a website that allows residents of the forum state to purchase items through the website. *Id.* at 1165 (collecting cases).

The plaintiffs' Amended Complaint makes a prima facie showing of minimum contacts. The defendant clearly purposefully directed its activities at Kansas by choosing to set its default IP geolocation within the state, thus connecting the state with millions of IP addresses, and then publishing and selling this information to thousands of users. (Doc. 10 ¶ 16). The defendant made this choice deliberately, indifferent to the likely consequences to residents of the form or the forum itself. (Doc. 10 ¶ 15). By these actions, the defendant directed thousands of its users to contact the state of Kansas continually since 2002. (Doc. 10 ¶ 14).

Moreover, the defendant maintains a website on which it publishes databases containing this geolocation information, both for public download and sale to paying customers. (Doc. 10 ¶¶ 17–18). Over 5,000 companies have drawn information from the defendant's website. (Doc. 10 ¶ 16). By its own admission,

the defendant has "transacted business within the State of Kansas," (Affidavit of Maxmind, ¶ 4), and has customers within the state (Doc. 5, p. 10). These contacts gave rise to the plaintiffs' claims in this case. But for the defendant's decision to set the plaintiffs' residence as its default IP geolocation and electronically distribute that information to customers inside and outside of Kansas through its website, the plaintiffs' injuries wouldn't have happened. Under these circumstances, the defendant should reasonably anticipate being haled into a Kansas court.

Next, the Court must consider whether its exercise of personal jurisdiction over the defendant would offend traditional notions of fair play and substantial justice. *Rainy Day Books, Inc.*, 186 F. Supp. 2d at 1166 (citing *Internat'l Shoe Co.*, 326 U.S. at 320). Five factors are relevant: (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiffs' interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interests of the several states in furthering fundamental substantive social policies. *Id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

Any inconvenience the defendant in this case may experience as a result of litigating in Kansas would not be constitutionally unreasonable, particularly "in this era of Internet Communications, faxes, telecommunications, and relatively inexpensive travel." *See Rainy Day Books, Inc.*, 186 F. Supp. 2d at 1166–67. This

Court has a strong interest in adjudicating the rights of the plaintiffs, who are Kansas residents injured within Kansas. This forum undoubtedly provides the most convenient and effective one for the plaintiffs, and promises to be the location of most of the witnesses and evidence in this case. The overarching interests of the interstate judicial system and the several states are all served by this Court exercising jurisdiction over the defendant. Finally, the defendant makes no assertion that exercise of jurisdiction would be unreasonable or otherwise violate traditional notions of fair play and substantial justice.

Absent a "compelling case" from the defendant that the presence of some other considerations would render jurisdiction unreasonable, which the defendant has not made and cannot make, this Court has specific personal jurisdiction over the defendant for the plaintiffs' claims.

## III. CONCLUSION

The plaintiffs suffered horrible wrongs at the hands of the defendant. Over the years, the defendant assigned the IP address of 600 million computers to the plaintiffs' home. The defendant claims it should not have to come to this jurisdiction to answer for those wrongs. The Kansas long-arm statute says otherwise. The legislature has clearly expressed a strong interest in protecting the rights of Kansans injured in this state by the acts of others. It is the defendant's demand that this matter be heard in Massachusetts that offends due process.

Respectfully submitted,

DEPEW GILLEN RATHBUN & MCINTEER LC


s/Randall K. Rathbun
Randall K. Rathbun #09765
8301 E. 21st Street N., Suite 450
Wichita, KS 62706-2936
Telephone: (316) 262-4000
Fax: (316) 265-3819
Email: Randy@depewgillen.com
*Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of September, 2016, a true and correct copy

of the above and foregoing **Response to Defendant's Motion to Dismiss** was filed

via the U.S. Court CM/ECF system and notice sent electronically to:

Casey O. Housley
Jordon T. Stanley
Sanders Warren & Russell LLP
40 Corporate Woods
9401 Indian Creek Parkway, Suite 1250
Overland Park, KS 66210
*Attorneys for Defendant*


s/Randall K. Rathbun
Randall K. Rathbun